IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 1, 2024

**IN RE MATTHEW D.**

**Appeal from the Circuit Court for Roane County**
**No. 21-CV-41          Michael S. Pemberton, Judge**
_____

**No. E2023-00880-COA-R3-PT**
_____

This is an appeal of a termination of a mother's parental rights to her son. Ashley D. ("Petitioner"), who has maintained custody of Matthew D. ("the Child") since he was four months old, sought termination of the parental rights of Natalie D. ("Mother").[1] The Circuit Court for Roane County ("the Trial Court") found that clear and convincing evidence established the statutory ground of abandonment by failure to support and that it was in the best interest of the Child that Mother's parental rights be terminated. Mother appeals. We affirm the Trial Court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ARNOLD B. GOLDIN, J., joined.

Allison M. Rehn, Harriman, Tennessee, for the appellant, Natalie D.

Brian E. Nichols, Loudon, Tennessee, for the appellee, Ashley D.

**OPINION**

**Background**

The Child was born to Mother in February 2019. The Child's father ("Unknown Father") is unknown and not a party to this appeal. On May 7, 2021, Petitioner filed a petition for adoption and termination of Mother's and Unknown Father's parental rights.

_____

[1] The Child's legal name is Julian D. Petitioner listed the Child's name as Matthew given that she was proposing that his name be changed to Matthew if the termination petition was granted.

Petitioner stated that the Child had been in her sole care and custody since July 2019, following the Child's removal from Mother's custody due to allegations of drug exposure and Mother's inability to care for the Child. Petitioner alleged the following statutory grounds for termination of parental rights: (1) abandonment by failure to visit by Mother and Unknown Father, (2) abandonment by failure to support by Mother and Unknown Father, and (3) persistence of conditions as it related to Mother. Petitioner further alleged that termination of Mother's and Unknown Father's parental rights was in the Child's best interest.

Mother, acting *pro se*, filed an answer, contesting the alleged ground of abandonment by failure to visit. She claimed that Petitioner had alienated her from the Child and had not complied with court-ordered visitation. The Trial Court then appointed Mother counsel, although no such order is present in the record.

Trial was on May 12, 2023, and Petitioner, Mother, and Mother's sister ("Aunt") testified. Petitioner explained how she came to have sole care and custody of the Child. According to Petitioner, the Child was removed from Mother's custody after Mother was pulled over by police for driving under the influence of methamphetamine. Mother testified that she was convicted in August 2020 of selling, manufacturing, and delivering 0.5 grams of methamphetamine for which she was currently serving a five-year sentence of probation. The basis for this conviction was a charge she received in 2017, prior to the Child's birth. The Child was first placed in the temporary custody of Aunt in May 2019. In July 2019, the Child, who was approximately four months old, was placed with Petitioner. Petitioner was acquainted with members of the Child's family. At the time of the trial, the Child was over four years old.

Petitioner further testified that the Child had been diagnosed with Autism. She explained that he receives therapy five days per week and that structure and routine are incredibly important for him. According to Petitioner, if the Child's routine is disrupted, his symptoms are exacerbated.

Despite her past methamphetamine use, Mother testified that she had entered a sober living facility in Cookeville in September 2020 and stayed there until March 2021. She then transferred to a facility in Knoxville. She testified that she had successfully completed the drug rehabilitation program and has maintained her sobriety since then. She also testified that she had obtained housing in October 2021 and has lived in the same home continuously since then. Mother's daughter, who was thirteen years old at the time of trial, was returned to Mother's custody in February 2022.

The Trial Court determined that Petitioner had proven by clear and convincing evidence the ground of abandonment by failure to support but had failed to sufficiently prove the grounds of abandonment by failure to visit and persistence of conditions. The Trial Court further determined that Petitioner had proven by clear and convincing evidence

- 2 -

that termination of Mother's parental rights was in the Child's best interest. The Trial Court entered a judgment reflecting these findings and granting Petitioner's termination petition on June 30, 2023. Mother appeals.

## Discussion

Although not stated exactly as such, Mother raises the following issues on appeal: (1) whether the Trial Court erred in finding that clear and convincing evidence established the ground of abandonment by failure to support and (2) whether the Trial Court erred in finding that clear and convincing evidence established that termination of Mother's parental rights was in the Child's best interest.

As our Supreme Court has instructed regarding the standard of review in parental rights termination cases:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[2] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388. "Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S.Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59, 102 S.Ct. 1388.

---

[2] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(*l*)(1); *see also Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S.Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id*.; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-113(c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[3] for termination exists and

---

[3] Tenn. Code Ann. § 36-1-113(g)(1)-(13).

that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[4] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n. 15 (Tenn. Ct. App. 2007)).

---

[4] Tenn. Code Ann. § 36-1-113(i).

### B. Standards of Appellate Review

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered). In conjunction with a best interest determination, clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

On May 7, 2021 when Petitioner filed her termination petition, the relevant ground for termination of parental rights was set out in statute as follows:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
>
> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

Tenn. Code Ann. § 36-1-113(g)(1) (West April 22, 2021 to June 30, 2021).

Abandonment is statutorily defined as the following:

For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(i) (West March 6, 2020 to June 30, 2021).

In finding clear and convincing evidence for this ground, the Trial Court made the following findings of fact:

Turning to the evidence in respect to the grounds for Termination of Parental Rights, specifically the ground of failure to pay support, the Petitioner introduced exhibit 1, TCSES report, which sets forth the child support payments made. The Court finds that during the relevant four-month time period prior to filing of the Petition on May 7, 2021, the Mother failed to make the requisite payments for support. The Court notes that subsequent to filing of the complaint and subsequent to Mother's release or graduation/completion of her drug rehabilitation program, she has paid over $8,000.00 of child support since that time, with one of those payments being almost $4,000.00, an amount that would have been her tax refund for 2021. The Court notes that Mother has paid support, but it commenced after the filing of this Petition. Therefore, the Court has no alternative but to find that under TCA § 36-1-113(g)(1), the Petitioner has proven by clear and convincing evidence that there was abandonment by failure to pay child support during the four-month consecutive period prior to the filing of the petition.

On appeal, Mother argues that she provided support for the Child, explaining:

Generally, testimony of the parties concurred that there were not any payments made through the Department of Human Services Child Support Enforcement Services during that four-month time period. However, while an exact date was never identified, Appellant did, at least once, provide a $50.00 money order to Appellee sometime between September 2020 and March 2021. Furthermore, Appellant provided, on several occasions including in December 2020, some "hand-me-down" clothing, toys, or other gifts for the Child while exercising her supervised visitations with the Child.

(Citations to the record omitted.) Mother additionally argues that her failure to support during the relevant four-month period was not willful given that she was "attending two

separate in-patient 'sober living' rehabilitation facilities from September 3, 2020 to March 2021 at Independence Again in Cookeville, TN and from March 2021 at Never Alone in Knoxville, TN until successfully discharged."

We first address Mother's argument that she provided $50 and some hand-me-down items. The relevant four-month period to consider is January 7, 2021 to May 6, 2021. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) ("[T]he applicable four month window . . . includes the four months preceding the day the petition . . . is filed but excludes the day the petition is filed."). When asked whether she received "any help whatsoever with the support of this child from any source," Petitioner testified: "No, sir. I did file for child support upon recommendation, but it's spotty. There have been a few payments made here and there when they find where she's working or her taxes have been garnished, but nothing consistent. I have never received a full payment." Petitioner further testified that she received no payments from Mother during the relevant four-month period. As support, Petitioner presented a document from the Tennessee Child Support Enforcement Services ("TCSES") website, showing that Mother made no payments during the relevant four-month period.

When she was asked whether she received any child support payments that did not go through the TCSES account, Petitioner affirmed that she did not. Although she testified that there was a "purge payment through the Court" and that Mother's "taxes were taken" after the petition was filed, Petitioner reiterated that Mother made no payments prior to May 2021. It appears the first payment made by Mother was August 5, 2021, three months after the petition was filed. When asked whether Mother provided any other forms of support such as diapers, clothing, or formula, Petitioner responded:

> No, ma'am. No formula, no diapers. There was one time when she gave some hand-me-down clothes that were too small. Literally one outfit would fit him, and it didn't match. But there was that, the hand-me-down clothes. But, no, nothing has ever been given or paid.
>
> * * *
>
> She had him some Christmas gifts, I believe, that were hand-me-downs. There was a few things. I believe she signed up for like the Angel Tree one time. And it wasn't given at the holidays either because she did not have a visit because she did not try to have a visit. It was after.

Petitioner later clarified that Mother provided the hand-me-down clothing in December 2020.

Mother testified to much the same. Mother testified that although she was in a Cookeville rehabilitation facility from September 2020 until March 2021, she was able to

work two jobs during this time period. Mother did not deny that the first payment she made through TCSES was in August 2021 but noted that she may have provided a $50 money order prior to that. When asked whether she had provided the $50 money order to Petitioner during the period between September 2020 and March 2021, Mother responded: "Probably, or I bought clothes and gifts for him, yes."

The Trial Court found that Mother did not provide support until after the petition was filed. This was a reasonable conclusion based upon the uncertainty of Mother's testimony regarding when she provided the $50. In contrast, Petitioner was quite certain that she received nothing from Mother during the four-month time period. The evidence does not preponderate against the Trial Court's finding that Mother did not provide support during the four-month determinative period.

The Trial Court's finding that Mother provided no support during the four-month period is further bolstered by its finding in its best interest analysis that Mother did not dispute this statutory ground at trial. We agree. Mother, for the first time on appeal, contends that her failure to support the Child was not willful. In her answer to the petition, albeit filed *pro se*, Mother argued only that her failure to visit was not willful. She made no such argument as it related to her failure to support. Mother's lack of willfulness was also not raised at trial. In her opening statement, Mother's attorney did not mention lack of willfulness as a defense. Mother's attorney asked one question during trial that could have led to proof of lack of willfulness—whether Mother had the ability to work while in the rehabilitation facility. However, Mother answered in the affirmative, and Mother's attorney asked no follow-up questions that could have called into question Mother's ability to work or ability to provide support. The evidence further demonstrated that she worked two jobs during this time period. Mother simply did not present any evidence of her lack of willfulness, which was her burden to prove. *See* Tenn. Code Ann. § 36-1-102(1)(I) ("The parent or guardian shall bear the burden of proof that the failure to visit or support was not willful.") (West March 6, 2020 to June 30, 2021). In closing arguments, Petitioner's attorney argued that Mother had paid no support during the relevant time period and noted her testimony that she had had the ability to work during this time period. In her closing argument, Mother's attorney neither raised Mother's lack of willfulness nor countered opposing counsel's argument.

Neither Mother acting *pro se* nor Mother's attorney raised the affirmative defense to this ground either in a filing or at trial. We accordingly find Mother's argument that she did not willfully fail to provide support to be waived and affirm the Trial Court's finding of this ground. *See In re Imerald W.*, No. W2019-00490-COA-R3-PT, 2020 WL 504991, at *4 n.5 (Tenn. Ct. App. Jan. 31, 2020) ("[B]ecause the record contains no pleading by Mother that raises lack of willfulness as an affirmative defense, and because Mother raised no such defense at trial, we conclude that Mother waived this issue.").

We next address whether the Trial Court erred in finding that termination of Mother's parental rights was in the Child's best interest. On May 7, 2021, when Petitioner filed her petition, the statutory best interest factors read as follows:

(i)(1) In determining whether termination of parental or guardianship rights is in the best interest of the child, the court shall consider all relevant and child-centered factors applicable to the particular case before the court. Those factors may include, but are not limited to, the following:

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

(2) When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest.

(3) All factors considered by the court to be applicable to a particular case must be identified and supported by specific findings of fact in the court's written order.

(4) Expert testimony is not required to prove or disprove any factor by any party.

(5) As used in this subsection (i), "parent" includes guardian.

Tenn. Code Ann. § 36-1-113(i) (West April 22, 2021 to June 30, 2021).

With regard to making a determination concerning a child's best interest, the Tennessee Supreme Court has instructed:

When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to

the best interests analysis. *In re Carrington H*., 483 S.W.3d at 523 (citing *In re Audrey S*., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S*., 455 S.W.3d at 555 (citing *In re Audrey S*., 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id*. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S*., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id*. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. *In re Audrey S*., 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. *See In re Audrey S*., 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. *In re Carrington H*., 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S*., 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194).

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

On appeal, Mother argues that the Trial Court erred in finding that termination of her parental rights was in the Child's best interest, pointing to her successful efforts to achieve sobriety and stability. She points to the fact that she sought substance abuse treatment, maintained sobriety for approximately two years, successfully completed a rehabilitation program, obtained housing, gained employment, began making child support payments, and regained custody of her thirteen-year-old daughter. She also contends that she did not have an opportunity to foster a meaningful relationship with the Child because of her stay in rehabilitation facilities as well as her communication issues with Petitioner.

- 12 -

In sum, Mother argues that some factors weighing in favor of termination are "a result of circumstance and not for a lack of [her] effort or desire."

We note that the Trial Court did consider Mother's accomplishments in making its best interest determination. The Trial Court found that Mother had remedied the conditions that led to the Child's removal. The Trial Court found that Mother "should be praised for dealing with her drug addiction and continuing to work her recovery program" and noted her testimony that she has maintained her sobriety. The Trial Court also considered Mother's circumstances in relation to her infrequent visitation. The Trial Court considered Mother's lack of visitation "against the backdrop of the obstacles she faced with visitation while living in a sober living facility for 6 months" and the communication issues between Mother and Petitioner. However, while considering these accomplishments and obstacles, the Trial Court's focus was rightly on the Child and his best interest.

As our Supreme Court has explained:

When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id.* "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

*Id.* at 681-82. The focus, therefore, should be on the child rather than the parent once a trial court has found a statutory ground for termination and has moved on to the best interest consideration.

Despite Mother's sobriety, the Trial Court found that the Child was "much more likely to continue to receive the care and treatment he is currently getting in the custody of the Petitioner." The Trial Court found that the Child had a critical need for stability given his Autism diagnosis and that a change of environment would have a negative effect on the Child's psychological, emotional, physical and medical condition. The Trial Court explained that the Child had only ever known Petitioner's environment and that Petitioner was the person who had taken the Child to health care providers, had obtained the diagnosis, and had been involved with his daily treatment. In contrast, the Child only spent approximately three months of his life in Mother's care. The Trial Court found that the Child has never really known Mother and that no bond existed between Mother and the Child. Based in large part on the Child's critical need for stability, Petitioner's environment and care for the Child, and the fact that Mother is a near-stranger to the Child, the Trial Court concluded: "To change horses in the middle of the stream at this point would [be] a grave error in this court's judgment given what is necessary for this special needs child to progress and hopefully to flourish." The evidence does not preponderate

- 13 -

against these findings, and clear and convincing evidence supports the Trial Court's determination that termination of Mother's parental rights was in the Child's best interest. We accordingly affirm the Trial Court's judgment.

## Conclusion

Upon our review, we affirm the Trial Court's judgment terminating Mother's parental rights to the Child, and this cause is remanded to the Trial Court for collection of costs below. Costs on appeal are assessed against appellant, Natalie D., and her surety if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE